EXHIBIT "H"

WWW.GVLAW.COM

# GALLO VITUCCI KLAR
LLP

August 22, 2018

Richard Gonzalez
Long Island Office
rgonzalez@gvlaw.com
646.695.1726

To:     Rear Admiral Mark H. Buzby, U.S. Navy (Ret.)
        Maritime Administrator
        U.S. Department of Transportation
        Maritime Administration
        West Building
        1200 New Jersey Avenue, SE
        Washington, DC 20590

Via:    Rear Admiral James A. Helis, U.S. Maritime Service
        Superintendent
        United States Merchant Marine Academy
        300 Steamboat Road
        Kings Point, New York 11024

Subject:    **APPEAL OF DISENROLLMENT OF MIDSHIPMAN ELIAS J. YU, USNR,
            XXX-XX-8053, CLASS OF 2019, FROM THE U.S. MERCHANT MARINE
            ACADEMY**
            Our File No.:  MSIC-2018-01

Ref.    (a)     U.S. Merchant Marine Academy, Superintendent Instruction
                2018-7, Midshipman Regulations, dated June 27, 2018
        (b)     Superintendent, U.S. Merchant Marine Academy, Disenrollment
                Letter, dated August 1, 2018 (Attached herein as Exhibit "**A**".)

Dear Admiral Buzby:

In accordance with reference (a), Chapter 6.9, Midshipman Elias J. Yu, USNR, respectfully
**appeals** the Superintendent's disenrollment decision as contained in reference (b), and hereby
requests to remain a midshipman at the U.S. Merchant Marine Academy.

## SUMMARY

Midshipman Yu is a first-class midshipman.  He has a 3.13 Cumulative GPA.  He is a member of
the Academy football team and is a logistics and intermodal transportation major.  Aside from the
proceedings that are the subject of this appeal, he has never been the subject of an Executive Board
proceeding, nor been the subject of any serious disciplinary action, nor been the subject of any
performance review board.  This is an appeal which arises out of the Superintendent's decision to
disenroll Midshipman Yu despite the Executive Board's determination that he be retained.  This
was also his first and only alcohol related incident.

**Manhattan** 90 Broad Street, 12th Floor, New York, NY 10004 • **New Jersey** 1 University Plaza, Suite 306, Hackensack, NJ 07601
**Westchester** One Bridge Street, Suite 140, Irvington, NY 10533 • **Long Island** 100 Crossways Park West, Suite 305, Woodbury, NY 11797

MAILING ADDRESS:  100 CROSSWAYS PARK WEST, SUITE 305, WOODBURY, NY  11797  •  212.683.7100

Following an overseas incident, Midshipman Yu was charged with seven violations of the 2011 USMMA Midshipman Regulations, as revised in Superintendent Notice 2016-04 USMMA Sea Year Policy.  Following an Executive Board Hearing, Midshipman Yu was found guilty on six of the charges during Phase I of the Executive Board proceedings. However, as demonstrated by the record, he was found guilty by a bare majority on most of the charges.  During Phase II of the Executive Board proceedings, after considering the testimony of multiple witnesses and the entire academic, extracurricular, and disciplinary record of Midshipman Yu, that same Executive Board recommended that Midshipman Yu be retained at the Academy and setback to the Class of 2020, that he continue with alcohol counseling, that he attend anger management class, and that he contribute in "some way" to the Sea Year lecture on alcohol in order to bring attention to the dangers of drink spiking overseas.  However, the Superintendent, decided to disenroll Midshipman Yu from the Academy in disregard of the recommendation of the Executive Board.

This appeal is respectfully submitted on the basis that the Executive Board's findings about guilt during Phase I were not based on admissible evidence, that it improperly applied vague standards/requirements from superseded regulations/notices, that its findings were not supported by available evidence, and that the Superintendent's decision to disenroll Midshipman Yu from the Academy was improper.  Furthermore, the charges and the proceedings against Midshipman Yu were improper, as they violated basic principles of law, fairness and due process.

## PARTICULARS OF THIS MATTER

### A.    Summary

On **December 8, 2017**, Midshipman Yu, of legal drinking age and over twenty-one (21) years old, allegedly consumed an excessive amount of alcohol while on authorized shore leave on Bahrain, from the USNS TIPPECANOE.  This consumption allegedly leads to him being involved in a physical altercation with a foreign national, stealing his vehicle with passengers onboard, losing control of that vehicle and causing damage to several motorcycles.  Midshipman Yu was arrested by Bahrain government authorities.  Midshipman Yu testified that he could not remember the incident occurring.

Bahrain governmental authorities conducted blood and alcohol tests of Midshipman Yu, but they did not conduct any drug tests.  Bahrain governmental authorities notified the NCIS for assistance. NCIS agents responded and questioned Midshipman Yu.  Midshipman Yu cooperated fully with the NCIS agents and informed them that he could not remember anything about the alleged incident.  Midshipman Yu was released to the custody of NCIS, who transferred him back to the vessel.

The following date, NCIS met with Midshipman Yu and again questioned him about the incident. Midshipman Yu again informed them that he could not remember anything about the incident and notified them that he suspected he might have been the victim of a drugged or "spiked drink".  NCIS obtained evidentiary samples (blood and urine) from Midshipman Yu.  (Note: There is no evidence that the NCIS obtained any warrant to obtain Midshipman Yu's urine or blood samples.)

Midshipman Yu then prepared to make financial reparations for the vehicle and motorcycle damages and no formal charges were filed in Bahrain.

Thereafter, Midshipman Yu was removed from the vessel and flown back to the United States on December 13, 2017, depriving him of the opportunity to complete his required sea year underway training requirements. Up to that time, Midshipman Yu's performance afloat had been very good, without any behavioral deficiencies noted.

Upon arrival at the U.S. Merchant Marine Academy (hereinafter the "Academy"), Midshipman Yu was restricted to Academy grounds. Some three (3) months later on March 11, Academy enrolled Midshipman Yu in regular academic courses. An independent hair toxicology report identified Midshipman Yu with trace of GHB, a well-known date rape drug, and Tramadol, very powerful analgesic and muscle relaxant prescription drug for period covering November 24-December 22, 2017. He has not been permitted to return to sea to date. The Academy's Executive Board's primary decision recommendation was to retain Midshipman Yu and setback one class year.

It has been over eight (8) months since the Midshipman Yu was brought back to the Academy. Since his return, he has not received any demerits, has not received any discipline infractions, has not been placed on report (aside from the instant matter), and he continues to maintain utmost good behavior and decorum. He continues to take academic courses and this past semester he earned a QPA of 3.514. Furthermore, this past summer he distinguished himself while training incoming Academy class members.

## B.     Incident Specifics

The evidence and testimony of the witnesses establishes that, on **December 8, 2017**, at approximately 18:00, Midshipman Yu, accompanied by Midshipman Ing Hao Veasna, departed the USNS TIPPECANOE. Prior to departing the vessel neither of them had consumed any alcohol. They arrived at Naval Support Activity Bahrain around 18:45, where both of them withdrew same amount of money from the Navy Federal ATM. From there, Midshipman Yu and Mr. Veasna went to the Chief Engineer's hotel room and arrived there at approximately 19:30. While at the hotel room, Midshipman Yu had his first alcoholic drinks, consisting of three (3) small mixed drinks of Jack Daniels and Coke. Mr. Veasna had the same amount of drinks. The time was approximately 20:00. At all times mentioned herein, Midshipman Yu was twenty-one years old.

While at the hotel, Midshipman Yu and Mr. Veasna met with the Chief Mate of the USNS TIPPECANOE, and they departed together at approximately 20:30, towards a bar down the road, where the Chief Mate thought the Captain might be. They took and taxi and arrived at the bar – a "western" themed bar – and went in. They did not find the Captain, so they left. Midshipman Yu did not have anything to drink at this bar.

From there, the party took a taxi to "Rocky's Cafe", at the Ramee International Hotel. They arrived at Rocky's around 21:00. Midshipman Yu purchased one (1) beer (Bud Light) and played a couple of pool games with Mr. Veasna and the Chief Mate. After playing pool a while, the three of them

bought a "bucket of beers", which contained 6 Bud Lights.  Each of them took one (1) beer from the bucket.  (Note: This was Midshipman Yu's fourth (4) alcoholic drink that evening.)

Midshipman Yu noticed some girls nearby and went to speak with them.  Mr. Veasna witnessed Midshipman Yu approach the girls.  The girls did not speak much English, but Midshipman Yu remained with them attempting to communicate with signs and "small words".  After a few minutes, and to Midshipman Yu's surprise, one of the girls asked for him to get a hotel room.  Midshipman Yu declined, but remained next to the girls.  Suddenly, one of the girls offered him a drink.  The drink was in a green opened container, with foreign language writing and appeared to be a beer.  Midshipman Yu accepted the drink, although he still had with him the beer he had taken from the bucket – i.e. his second beer.  The drink given to him by the girls was half full and did not smell strange.  Once Midshipman Yu took the drink, the girls starter to giggle and made hand motions for Midshipman Yu to drink.  Midshipman Yu drank the entire drink he had been given.  Midshipman Yu testified that the drink tasted like a beer, with some minor after taste.  Mr. Veasna testified that he witnessed Midshipman Yu with the drink given to him by the girls.  Mr. Veasna also testified that Midshipman Yu was out of money by that time, as both of them had withdrawn the same amount of money and purchased the same amount of alcohol.  Mr. Veasna reasoned that since he was out of money, Midshipman Yu must therefore be out of money as well.  It was not possible for Midshipman Yu to purchase any more alcohol.  (Note: This would have been Midshipman Yu's fifth (5) alcoholic drink that evening.)

Five to ten minutes after consuming the drink the girls gave him, one of the vessel's crewmembers (an able-bodied seaman) approached Midshipman Yu and asked him to finish his remaining beer from the bucket.  Midshipman Yu then drank his second beer (which he had taken from the bucket), walked away from the girls and picked his third beer from the bucket.  (Note: This would have been Midshipman Yu's sixth (6) alcoholic drink that evening.)  Midshipman Yu drank the beer and left "Rocky's" with the able-bodied seaman, Mr. Veasna and the Chief Mate.  The time was approximately 22:00, around 20 minutes after consuming the drink given to him by the girls.

From 22:00, and on, Midshipman Yu has no clear recollection of having had any additional alcoholic drinks, and none of the witnesses testified that Midshipman Yu consumed any additional alcoholic drinks.  Despite this, Midshipman Yu testified that he "vaguely" remembers dancing with a girl at a bar ("Wranglers") after leaving "Rocky's" and maybe holding a drink.  (Note: If so, this would have been Midshipman Yu's seventh (7) alcoholic drink that entire evening.)  No other witness testified as to this additional drink.  Midshipman Yu testified that he cannot remember the events that occurred from hereon.

At approximately 00:05, **December 9, 2018**, Midshipman Yu reportedly took the vehicle belonging to a Chinese national drove it off, resulting in his arrest by the Bahrain authorities.  Next thing Midshipman Yu remembers is waking up in the morning in a holding cell, not knowing how I got there or what had happened.   Midshipman Yu was then questioned by the Bahraini authorities, the NCIS and eventually returned to the U.S.

C.    **Seeking Alcohol Evaluation**

On or about **January 18, 2018**, concerned about the Bahrain incident and his inability to remember anything about it, Midshipman Yu voluntarily presented himself at the Academy's Clinic, Patten Hall, seeking an alcohol dependency evaluation. Reportedly, Dr. Richard Wall, Clinic Supervisor, denied his request for an evaluation, and referred him to seek an evaluation by an outside professional and at his own expense.

On **February 1, 2018**, Midshipman Yu sought an alcohol evaluation at Northwell-Zucker Hillside Hospital, Addiction Recovery Services. On **February 15, 2018**, Ms. Claire Soldano, LCSW, Zucker Hillside Hospital, Northwell Health, issued a letter regarding their evaluation of Midshipman Yu. Ms. Soldano's letter is silent in regard to any alcohol or substance dependency. Nonetheless, Midshipman Yu was tested multiple times at Northwell-Zucker Hillside Hospital, and each time he tested negative for alcohol consumption.

D.    **Drug Testing – Hair Follicle**

On **February 8, 2018**, Midshipman Yu underwent a drug test (hair follicle) – again at his own cost. This test was done to determine the presence of any foreign substance (drugs) in his body. This type of test was advisable, as nearly ninety (90) days had elapsed since the Bahrain incident, and neither the NCIS nor the Academy, had presented Midshipman Yu with any evidence of any date rape drug tests having been conducted. The NCIS had not immediately collected blood and urine samples from Midshipman Yu following the incident. This failure lead to their inability to detect rapidly metabolizing date rape drugs in the system. Despite being present at the Academy since early December, and his continued allegations that he had been a victim of a spiked drink (i.e. date rape drugs) the Academy did not order Midshipman Yu to undergo any chemical testing.

On **February 26, 2018**, Midshipman Yu received the results of drug test (hair follicle) conducted. Midshipman Yu's test which came back positive. Contrary to ADM Helis's unsupported decision, specifically, Midshipman Yu's hair tested for the approximate time frame of **<u>November 24, 2017 to December 22, 2017</u>**, shows the presence of two common "date rape" drugs (GHB and Tramadol (opiates)). There is no clinical explanation for the presence of these drugs in Midshipman Yu's system. Academy conducted standard midshipmen drug test on Midshipman Yu in early weeks of November 2017 prior to starting his shipboard duties.

E.    **Charges and Executive Board**

1.    **Preliminary and Cancelled Charges**

On **February 28, 2018**, LCDR John Curran, placed Midshipman Yu Midshipman Yu on report for "*Honor Offense*" violations, and issue him an email titled "*Conduct Record Deficiency*". The issued offence description was: "*On 9 DEC 2017, ANM while assigned to the USNS Tippecanoe in Bahrain was arrested following assault on a Chinese national, theft of Chinese national's*

*vehicle with 6 year old and 1.5 year old Chinese national's children inside, and damage to motorcycles belonging to Saudi Arabian nationals. ANM is under 21 years old and consumed alcohol in violation of Academy or Shipboard rules and regulations. Time of incident was approximately 0010 on 09DEC2017.*"  (See "Conduct Record Deficiency" email dated February 28, 2018, attached herein as Exhibit "**B**".)  Midshipman Yu's defense counsel contacted counsel for the Academy, whom was unaware of the charges and seemed surprised.  Counsel for the Academy informed defense counsel that LCDR Curran's charges had been issued erroneously. Midshipman Yu was over 21 years of age.

## 2.    Notice of Executive Board Disciplinary Hearing – Charges

On **February 27, 2018**, the undersigned sent a letter to RADM Helis, via Ms. Ilene Kreitzer, Counsel for the Academy, notifying the Academy of the positive "date rape" drug test results, which could help explain the Bahrain incident and Midshipman Yu's inability to remember the incident.  (See defense counsel's letter attached herein as Exhibit "**C**", with enclosures.)

On **March 1, 2018**, and despite such evidence, Midshipman Yu was notified that the Academy had rejected his request, and that he would be charged shortly with several violations to the Academy's regulation.  The Academy did not address the evidence presented, nor did it offer any reason for its decision.  (See email from Academy's counsel dated March 5, 2018, attached herein as Exhibit "**D**".)

On **March 14, 2018**, over three (3) months, after the Bahrain incident, Rear Admiral (RADM) Susan L. Dunlap, Deputy Superintendent, served Midshipman Yu with a "Notice of Executive Board Disciplinary Hearing".  Midshipman Yu was directed to, "*In accordance with Chapter 10, Section 1001 (a) of the 2011 USMMA Midshipman Regulations, as revised in Superintendent Notice 2016-07 USMMA Sea Year Policy*," appear before an Executive Board for a hearing to consider multiple charges against him. (See Notice of Executive Board Disciplinary Hearing dated March 14, 2018, attached herein as Exhibit "**E**".)  The specific charges against Midshipman Yu were:

> (1)    *On or about 09 December 2017, you failed to conduct yourself with propriety, sobriety, decorum and sound judgment by consuming an excessive quantity of alcohol, physically assaulting a Chinese national, stealing the Chinese national's 2012 Volvo with his six year old and one and one-half year old children inside, driving the vehicle down an alleyway and crashing it into motorcycles, and then fleeing on foot, in Juffair, Bahrain, in violation of Sections 102, 104.a.2, 201.a, and 1104 of the Midshipman Regulations, and paragraph 3 of Superintendent Instruction 2016-04, USMMA Sea Year Conduct Policy;*

> (2)    *On or about 09 December 2017, you physically assaulted a Chinese national, in Juffair, Bahrain, in violation of Sections 221.b and 1109.15 of the Midshipman Regulations;*

(3)  *On or about 09 December 2017, you consumed an excessive quantity of alcohol, and engaged in drunken behavior, including but not limited to, physical assault of a Chinese national, theft of the Chinese national's 2012 Volvo with his six year old and one and one-half year old children inside, drunken driving, damage of personal property of Saudi Arabian nationals, and fleeing on foot, in Juffair, Bahrain, in violation of Sections 204.a and 1105.c.3 of the Midshipman Regulations;*

(4)  *On or about 09 December 2017, you engaged in conduct which reflects discredit on the Academy and the Regiment of Midshipmen by consuming an excessive quantity of alcohol, physically assaulting a Chinese national, stealing the Chinese national's 2012 Volvo with his six year old and one and one-half year old children inside, driving the vehicle down an alleyway and crashing it into motorcycles, and then fleeing on foot from the scene of the crimes, in Juffair, Bahrain, in violation of Section 1109.11 of the Midshipman Regulations;*

(5)  *On or about 09 December 201 7, you operated a vehicle in a reckless or careless manner in such a way as to endanger the lives or property of others, in Juffair, Bahrain, in violation of Section 1109.13 of the Midshipman Regulations;*

(6)  *On or about 09 December 2017, you stole a Chinese national's vehicle, in Juffair, Bahrain, in violation of Section 1109.18 of the Midshipman Regulations; and,*

(7)  *On or about 09 December 2017, you willfully vandalized the personal property of Saudi Arabian nationals, in Juffair, Bahrain, in violation of Section 1109.5 of the Midshipman Regulations.*

The Academy noted that it intended to call two witnesses: Midshipman Ing Hao Veasna, and Midshipman Aaron Aldridge. The Executive Board hearing was scheduled for **March 21, 2018**. Midshipman Yu denied all charges.

Along with the **March 14, 2018**, "Notice of Executive Board Disciplinary Hearing". Midshipman Yu received an uncertified copy of the NCIS Investigation File (Report). (See NCIS Investigation File (Report), attached herein as Exhibit "**F**".)

On **March 15, 2018**, defense counsel requested an adjournment of the March 21, 2018 Executive Board hearing due to the over one hundred fifty (150) pages of NCIS report and Charge Packet materials some of which contained foreign language interpretation which could not be reviewed by Midshipman Yu's counsel in the five (5) days allotted. (See Exhibit "**G**".) On or about **March 19, 2018**, defense counsel received a telephone call from Mr. Kreitzer, wherein she communicated that the Academy granted our request and adjourned the hearing without date. (See email from defense counsel to Attorney Kreitzer dated March 19, 2018, confirming adjournment, attached herein as Exhibit "**H**".)

3.    **Second Revised Notice of Executive Board Disciplinary Hearing**

On **April 11, 2018**, RADM Dunlap served Midshipman Yu with a "Second Revised Notice of Executive Board Disciplinary Hearing", which included an "NCIS Supplemental Report". Authority, charges and members of the board, remained the same as in the previous hearing notice. However, the Academy added Captain Gene Albert, Head, Department of Professional Development and Career Services, as an additional Academy witness. The Executive Board hearing was scheduled for **April 23, 2018**. (See Notice of Executive Board Disciplinary Hearing dated April 11, 2018, attached herein as Exhibit "**I**".) Midshipman Yu denied all charges.

On **April 19, 2018**, Midshipman Yu submitted to the Academy a "Witness and Evidence List", for use at the Executive Board hearing. (Copy of the "Witness and Evidence List", with enclosures, is attached herein as Exhibit "**J**".) Following his submission, Midshipman Yu was informed that he needed to provide three (3) additional copies by the noon the following date, "*so that each Board member will have a copy*". The notices of hearing previously provided to Midshipman Yu did not specify how many copies Midshipman Yu was required to submit. Therefore, Midshipman Yu had submitted an original and one courtesy copy. Counsel for Midshipman Yu contacted Attorney Kreitzer requesting additional guidance on this request, noting that, Midshipman Yu had provided the required documentation ahead of time; that the memorandum (notice of hearing) received did not specify how many copies Midshipman Yu had to provide; that Midshipman Yu had provided one copy and a courtesy copy; that the demand to provide additional copies was unreasonable; and, noting that had such a requirement been disclosed we would have provided additional copies. In addition, counsel for Midshipman Yu provided an electronic copy of the submitted documentation. Attorney Kreitzer replied wherein she thanked for providing the electronic copy and stating that they (i.e. Academy) had everything they needed. (See email between counsel for Midshipman Yu and Attorney Kreitzer, dated April 19-20, 2018, attached herein as Exhibit "**K**".)

The following morning, on **April 20, 2018**, Midshipman Yu was summoned to appear before RADM Dunlap, who proceeded to chastise him without defense counsel present for submitting such a large witness list and instructed him that he was only permitted to have six witnesses testify at his Executive Board hearing. Reportedly, RADM Dunlap stated words to the effect that 'she didn't want the hearing to take all afternoon'. Counsel for Midshipman Yu immediately contacted Attorney Kreitzer and informed her of such demand. (See email between counsel for Midshipman Yu and Attorney Kreitzer, dated April 20, 2018, attached herein as Exhibit "**L**".) Following a telephone conversation between Midshipman Yu's counsel and Attorney Kreitzer, Attorney Kreitzer stated that Midshipman Yu would be permitted to call any and all witnesses he wished at the hearing. Attorney Kreitzer only requested that Midshipman Yu voluntarily limit "repetitive" witnesses if possible, but that it was up to Midshipman Yu if he wanted to call everyone. Midshipman Yu thereafter agreed to voluntarily reduce his list of in-person testifying witnesses but reserved his right to call any prior identified witness if he deemed necessary at the hearing. (See email between counsel for Midshipman Yu and Attorney Kreitzer, dated April 20, 2018, attached herein as Exhibit "**M**".).

Late afternoon that same day, **Friday**, **April 20, 2018,** after conclusion of normal business hours (1754 hrs.), and just a weekend prior to Monday's Executive Board hearing, Midshipman Yu was

notified of the adjournment of the hearing via email, because the Academy's witnesses were not available. Midshipman Yu, his forensic toxicology expert and witnesses, were ready to proceed as scheduled. Despite the prior hearing notices of **March 14, 2018** and **April 11, 2018**, the Academy had just realized that its intended witnesses, Mr. Veasna and Mr. Aldridge, were unavailable to testify because they were still deployed at sea. The Academy requested Midshipman Yu agree to waive the testimony of the Academy's witnesses. Midshipman Yu declined. The hearing was thereafter adjourned without date by the Academy. (See email between counsel for Midshipman Yu and Attorney Kreitzer, dated April 20 and 23, 2018, attached herein as Exhibit "**N**".)

## 4.     New Midshipman Regulations

Over two months later, on **June 27, 2018**, the Academy issued a **new** Superintendent Instruction 2018-7, Midshipman Regulations, which **superseded** the prior Midshipman Regulations dated May 11, 2011. (See Exhibit "**O**", cover pages, para. 4. "*Supersedes. Midshipman Regulations dated 16 May 2011; … SI 2016-04, Sea Year Conduct Policy*" attached herein.)

## 5.     Fourth Revised Notice of Executive Board Disciplinary Hearing[1]

On **July 17, 2018**, over seven (7) months after the Bahrain incident, and nearly three (3) months after the prior adjournment, RADM Dunlap served Midshipman Yu with a "Fourth Revised Notice of Executive Board Disciplinary Hearing". (See Fourth Notice of Executive Board Disciplinary Hearing dated July 11, 2018, attached herein as Exhibit "**P**".) Midshipman Yu denied all charges.

Recognizing that there was a **new** Midshipman Regulations in effect, Midshipman Yu was now directed to, "*In accordance with Chapter 6, Section 6.1 and 6.2 of the 2018 USMMA Midshipman Regulations, as set forth in Superintendent Instruction (SI) 2018-07,*" appear before an Executive Board for a hearing to consider multiple charges against him. Despite this, the cited charges against Midshipman Yu remained as specified in the prior hearing notices and referred to the citations on the superseded regulations. None of the charges against Midshipman Yu were updated to ensure they were contained and/or reflected in the new Midshipman Regulations (Superintendent Instruction 2018-7).

In what appears to be an effort to overcome this fatal defect failure, the Academy's hearing notice contained only a brief footnote: "*On 27 June 2018, the Superintendent promulgated revised Midshipman Regulations via Superintendent Instruction (SI) 2018-07. The Executive Board will follow the procedures set forth in Chapter 6 of SI 2018-07. Since the alleged misconduct with which you are charged occurred when the previous Midshipman Regulations were in effect, the charges reference the sections from those 2011 Midshipman Regulations.*" The Executive Board hearing was scheduled for **July 25, 2018**. (See Exhibit "**P**".) Midshipman Yu again denied all charges.

---

[1]  The "Fourth" notice should have been noted as the "Third" notice. This error appears to have been harmless.

In the latest hearing notice, the Academy removed Captain Gene Albert, and added Dr. Richard Wall, Department of Health Science, as a witness.  The Academy also substituted Midshipman Michelle Perri, the former Regimental Executive Office, with Midshipman Alexis Ibach, and incorrectly identified her in the hearing notice as "Regimental Commander."  (Note: Midshipman Ibach is the Regimental Executive Officer and not the Regimental Commander.)

On **July 23, 2018**, Midshipman Yu submitted a "Supplemental - Witness and Evidence List", for use at the Executive Board hearing.  (Copy of the "Supplemental - Witness and Evidence List", with enclosures, is attached herein as Exhibit "**Q**".)

### EXECUTIVE BOARD DISCIPLINARY HEARING

On **July 25, 2018**, an Executive Board hearing on this matter was held as announced under the "Fourth Revised Notice of Executive Board Disciplinary Hearing".  The hearing was chaired by RADM Susan L. Dunlap, Deputy Superintendent.  In addition to the chair, members of the board included: CDR David Pulis, Assistant Academic Dean; CDR Bradley Hawksworth, Head, Department of Naval Science; Dr. Gabriel Colet, Professor, Department of Marine Engineering MIDN Alexis Ibach, Regimental Commander (incorrect position).  (See Executive Hearing transcript, attached herein as Exhibit "**R**".)

The Academy called three witnesses: Dr. Richard Wall, Department of Health Services; MIDN Ing Hao Veasna; and, MIDN Aaron Aldridge.

Midshipman Yu did not call any direct witness.  However, he cross-examined each witness, and answered questions propounded to him by members of the Executive Board.  In addition, the Academy's last-minute cancelation of the **April 23, 2018** hearing had resulted in Midshipman Yu's inability to produce his expert witness, Dr. Richard Stripp, a forensic toxicologist.  This was because by the time of the cancellation, Midshipman Yu had already paid Dr. Stripp's appearance and testimony fee of three thousand dollars ($3,000) and the last-minute cancellation by the Academy resulted in that fee being lost.  The appearance and testimony fee required by Midshipman Yu's expert, was a significant amount of money expended expecting that the hearing would take place in April as scheduled.  Midshipman Yu simply could not run the risk of paying another testimony fee of three thousand dollars ($3,000), and for the Academy to cancel the hearing at the last minute as it had done before.  Therefore, Midshipman Yu was unable to produce his expert to testify in person and had to rely solely on his written report.  The Academy did not produce any expert report.

### A.    Phase I Findings

As noted in reference (b), the Executive Board found Midshipman Yu, "guilty" of violating multiple charges of the superseded regulation.  Specifically, Midshipman Yu was found guilty of charges 1, 2, 3, 4 and 6, by a split vote of 3-2; he was found guilty of charge 5, by a vote of 4-1; and not guilty on charge 7 by a vote of 5-0.  (See refence (b), attached herein as Exhibit "**A**".)

## B.    Phase II Findings

As noted in reference (b), the Executive Board reportedly considered Midshipman Yu's academic file and transcript, his personnel jacket, his company file, his Midshipman Profile, his Sea Year file, Midshipman Yu's voluntary statement, the voluntary statement of his advisor, Professor Michael Ales, the written character statements provided, and the oral testimony of fifteen (15) character witnesses (Dr. Daniel Fong of the Department of Mathematics and Science; MN John Robertson; MN Luke Theriault; MN Wiley Martin; MN Jacob Wallace; MN Andrew Daniel; Mr. Ralf Irizarry; LT John Jaeger of the Commandant's Office (by phone); MN Krystian Abbott; MN James Cannell; MN Tyson Blauw; MN Garrett Irizarry; MN Ivan Goretoy; MN Ing Hao Veasna; and Midshipman Yu's father, Mr. Jae J. Yu).  (See refence (b), attached herein as Exhibit "**A**".)

The Executive Board recommended that you Midshipman Yu be **retained** at the Academy and setback to the Class of 2020, that he continue with alcohol counseling, that he attend anger management class, and that he contribute in some way to the Sea Year lecture on alcohol in order to bring attention to the dangers of drink spiking overseas.  (See refence (b), attached herein as Exhibit "**A**".)

On **August 1, 2018**, and despite the Executive Board's recommendation, the Superintendent recommended disenrollment of Midshipman Yu.  (See refence (b).)


## APPEAL BASIS

It is respectfully submitted that the Executive Board's decision was not based on admissible evidence, that it improperly applied vague standards/requirements from superseded regulations/notices, that its findings were not supported by available evidence, and the Superintendent's decision to disenroll Midshipman Yu from the Academy runs afoul of the Midshipman Regulations.  Therefore, the Superintendent's decision should be set aside and Midshipman Yu should be allowed to continue and complete his studies as the U.S. Merchant Marine Academy.


## A.    Superseded Regulations

Midshipman Yu was charged with violating various sections of the 2011 Midshipman Regulations. However, the 2011 Midshipman Regulations were **superseded** by the 2018 Midshipman Regulations.  While a few of the sections and language transferred from the 2011 to the 2018 regulations, not all of them did.  Furthermore, some of the sections and language was clearly omitted.

It is common knowledge that a superseded regulation – similar to a law – is completely void of any effect, guidance, authority, power, etc., unless the new regulation expressly states that the prior regulation – or portions thereof – retain concurrent authority with the new regulation.  In the absence of such express language, the superseded regulation is completely without any authority. In such instance, any language contained in the superseded regulation which has not been expressly

transferred or joined in the new regulation, is also without any effect, guidance, authority, power, etc.

Nowhere in the 2018 Midshipman Regulations, does it provide for a midshipman to be charged, and/or tried for incidents that occurred while the superseded regulation was in effect.  Nonetheless, Midshipman Yu was subjected to such preposterous application of the superseded regulations, as if they were still in effect.

The 2011 Midshipman Regulation no longer exist.  If any of its provisions were to survive, they would have had to make it into the new 2018 Midshipman Regulation, or the new regulation would have to state such application.  Yet. That is not the case here.  This is a basic and simple violation of procedural matters.


**B.      The Findings Should be Set Aside – Charges**

It is respectfully submitted that the charges against Midshipman Yu were improper, as they are vague, violate basic principles of law, fairness and due process, are unsupported by the evidence, and/or are superseded by new regulations, therefore the Executive Board's findings on Phase I should be set aside.


1.      **First Charge**.  The first charge, against Midshipman Yu alleges that he "*failed to conduct himself with propriety, sobriety, decorum and sound judgment …  in violation of Sections 102, 104.a.2, 201.a, and 1104 of the 2011 Midshipman Regulations, and paragraph 3 of Superintendent Instruction 2016-04, USMMA Sea Year Conduct Policy*."  However, Sections 102, 104.a.2, 201.a, and 1104, are not chargeable offenses as written and appear to be mainly "guidance and ideals".  Specifically, these sections – as noted in the superseded regulation – read as follows:

**102. Professional Ethics:**
Midshipmen **must** conduct themselves with propriety, sobriety, decorum, and sound judgment. MIDSHIPMEN ARE **EXPECTED** TO EXERCISE MODERATION IN ALL THINGS AND **MUST** NOT ENGAGE IN ANY ACTIVITIES WHICH VIOLATE MUNICIPAL, STATE, OR FEDERAL LAWS.  A Midshipman's word is binding; his/her signature or initials attest to the truth and accuracy of a document.  A Midshipman's behavior **must** at all times reflect credit upon the individual, the United States Merchant Marine Academy, and the United States Maritime Service.

**104. Duty:**
a. Individual Responsibilities.

. . .

2. Midshipmen are **expected to act in accordance with the intent or spirit of these regulations, directives, and orders**. A Midshipman who is reported correctly for a deficiency is **expected to acknowledge and accept** the resultant disciplinary action.

**201. General:**

. . .

a. The above **standards of conduct will apply** to Midshipmen at all times, particularly at any activity sponsored by the Academy or where a midshipman is acting as a representative of the Academy.

**1104. Standards of Behavior:**

Midshipmen are **expected** to maintain a standard of behavior well above what may be acceptable social standards for college age men and women, and to exhibit maturity and responsibility in all environments. Those standards of manner and decorum **expected** from a commissioned officer and a gentleman or lady are expected of Midshipmen at all times. A Midshipman's action or words should not bring criticism against the Academy. If such conduct is observed of an individual who is identifiable as a member of the Regiment of Midshipmen, the charge will include that such conduct reflected discredit upon the Academy and the disciplinary award will be appropriately increased.

A plain reading of the above sections demonstrate that the charged sections are aspirational and not specifically chargeable offenses. Were these sections to actually be chargeable offences/violations, they would run afoul due to their vagueness. As you are aware, a regulation is considered to be vague when it fails to inform the person of the specific prohibited conduct; when it does not provide specific and clear objectives; when it can be applied arbitrarily; and, when it fails to limit the discretion of the government official who enforces such. Therefore, as demonstrated herein, Charge One against Midshipman Yu should have been dismissed in its entirely by the Executive Board, as it fails to contain chargeable offenses/violation, due to its vagueness, and due to the fact the 2011 Midshipman Regulations were superseded. However, despite such, the Executive Board found Midshipman Yu at fault here with a vote of 3 to 2. A very close split vote.

2. **Second Charge**. The second charge against Midshipman Yu was the he "*physically assaulted a Chinese national, in ... in violation of Sections 221.b and 1109.15 of the Midshipman Regulations*". Here, the referred section (221.b) was changed/deleted, and its language was carried over into the new regulation (See Chapter 3.7.4.a). On the other hand, Section 1109.15, was completely omitted in the new regulation. (Section 1109.15 read as follows "Engaging directly or indirectly in physical violence towards another person. Example: Fighting with another Midshipman.") It is respectfully submitted that the evidence used to support this charge is inadmissible and uncorroborated by independent witnesses. Thus, there is clearly reasonable doubt that the "physical assault" ever occurred as charged.

Furthermore, the only "evidence" of the alleged "assault" is the uncertified copies of the self-serving statement by the alleged victim. These copies run afoul of the best evidence rule and deprives Midshipman Yu of his due process right to confront his accuser. Additionally, despite Midshipman Yu's accuser stating that his spouse was present at the time of the alleged "assault",

the NCIS investigation report is blatantly absent of her statement.  The NCIS report does not even contain any agent's investigatory notes of having interviewed her.  This begs the question, "why isn't there a statement from the spouse attesting to the physical assault?"  The answer is simple, there was no physical assault!  The only supporting evidence thing we have is the inadmissible, uncorroborated and biased statement of the alleged victim.  Furthermore, despite the alleged victim stating that there were videos of the location of the incident, the NCIS investigators were unable to confirm such physical assault via independent means.  It is inconceivable that NCIS would not obtain all evidence relevant to this alleges assault, but also that the Academy would lent it much credibility.

Therefore, Charge Two against Midshipman Yu should have been dismissed in its entirely by the Executive Board as unproven, due to reasonable doubt it had occurred, lack of independent corroborating witness, that its purported evidence ran afoul of the best evidence rule, that it deprived Midshipman Yu of his due process right to confront his accuser, and due to the fact the 2011 Midshipman Regulations were superseded.  However, despite such, the Executive Board found Midshipman Yu at fault here with a vote of 3 to 2.  Another very close split vote.

3.    **Third Charge.**  The third charge is the most significant in this matter, wherein it is alleged that Midshipman Yu, "*consumed an excessive quantity of alcohol and engaged in drunken behavior… in violation of Sections 204.a and 1105.c.3 of the Midshipman Regulations*".  The evidence presented at the hearing and the witnesses' testimony casts serious doubts into whether Midshipman Yu has consumed an "excessive amount of alcohol.

However, before addressing such issue, we address Section 204.a and 1105.c.3, of the superseded Midshipman Regulations.  Similar to in prior charges, Section 204.a mainly contains "guidance and ideals", and its specific language provisions did not make it to the new regulations.  Specifically, Section 204.a in the superseded manual state:

> **204. Alcoholic Beverages:**
> For the purposes of these regulations, the term "alcoholic beverages" **will include** all forms of beer, wine, distilled liquors, and other fermented drinks regardless of the amount.
> a.  Consumption of any alcoholic beverage by Midshipmen **will be** in conformance with state and local laws and the Academy's guidelines.  Any alcohol abuse or drunken behavior **constitutes grounds** for disciplinary action.  Midshipmen **must accept** the consequences for any misconduct occurring following consumption of an "intoxicating beverage."  **No person under 21 shall** consume alcoholic beverages.

In Midshipman Yu's case, the evidence demonstrates that, (1) He consumed alcoholic beverages in Bahrain in conformance with local laws and the Academy's guidelines; and (2) **He was over 21 years old when he consumed alcohol in Bahrain**.  The other two sentences in this Section are clearly guidance, as one sentence mainly states that "drunken behavior constitutes grounds for disciplinary action", and the other sentence states that midshipmen "must accept" consequences of any misconduct.  Neither of these two remaining sentences state clearly that "drunken behavior" is a violation or offense chargeable against the midshipman which could lead to disenrollment from the Academy.  Furthermore, the language "must accept" is set in the future, to which a person

cannot be charged for something that has not been occurred.  Again, this section is vague and it was omitted from the new regulations.

Similarly, Section 11.c.3 in the superseded regulation appears to be simply a restatement of Section 204.a.  Specifically, Section 1105.c.3 in the superseded regulation reads as follows:

**Section 1105. Substance Abuse:**

. . .

c. Alcohol. For the purposes of these regulations, the term "alcoholic beverages" will include all forms of beer, wine, and distilled liquors regardless of the amount.

. . .

3. Any alcohol abuse or drunken behavior **constitutes grounds** for disciplinary action. Midshipmen who violate these regulations while drinking, or who are not physically capable of performing their duty, **remain totally responsible** for their actions and **must accept** the consequences for any misconduct occurring as a result of consuming alcoholic beverages.

Here, the two sentences from Section 204.a, have been combined into one sentence and expanded. However, such combination does not change the character of the sentences and they remain clearly aspirational guidance.  Again, this section is vague and was omitted from the new regulations. (See above discussion relating to Section 204.a.)

Therefore, as demonstrated herein, Charge Three against Midshipman Yu should have been dismissed in its entirely by the Executive Board, as it fails to contain chargeable offenses/violation, due to its vagueness, and due to the fact the 2011 Midshipman Regulations were superseded. However, despite such, the Executive Board found Midshipman Yu at fault here with a vote of 3 to 2.  A very close split vote.

4.    **Fourth Charge.**  The fourth charge against Midshipman Yu alleges that he "*engaged in conduct which reflects discredit on the Academy and the Regiment of Midshipmen by consuming an excessive quantity of alcohol… in violation of Section 1109.11 of the Midshipman Regulations.*" As demonstrated, there is no witness testimony anywhere that established that Midshipman Yu consumed an "excessive" quantity of alcohol.  The Academy's witness, Mr. Veasna consumed roughly the same amount of alcohol that Midshipman Yu, and he did not engage in any detrimental behavior.  The one and only difference in the amount of alcohol drank by Mr. Veasna and Midshipman Yu is the spiked drink consumed by Midshipman Yu.  Furthermore, as demonstrated above, the BAC test conducted by the Bahrain authorities is erroneous and without any supportable validity.

Unfortunately, the term "*conduct which reflects discredit*", is an extremely broad and vague term, wherein its interpretation depends on the person judging the conduct.  This vagueness lends itself

to biased and often unequal application.  What type of conduct reflect discredit is not defined in the superseded regulations – or even in the new regulations.  Perhaps Midshipman Yu's conduct reflected discredit, but there is a clear and compelling reason for his conduct – he was drugged.  Therefore, as he did not consume an excessive amount of alcohol, and his conduct is attributable to the ingestion of the drugs in the spiked drink, this charge in the superseded regulations must be stricken.

5.    **Fifth and Sixth Charges.**  The fifth charge against Midshipman Yu is that he allegedly "*operated a vehicle in a reckless or careless manner in such a way as to endanger the lives or property of others, … in violation of Section 1109.13 of the Midshipman Regulations*".  And, the sixth charge against Midshipman Yu is that he allegedly "*stole a Chinese national's vehicle, … in violation of Section 1109.18 of the Midshipman Regulations*".   Once again, Midshipman Yu is being charged for violating specific sections in the superseded regulation, i.e. the 2011 Midshipman Regulations.  While the superseded regulation contained the charged language, the entirety of the language/offenses was completely omitted in the new regulation.  Charging Midshipman Yu for an offense that has been superseded and eliminated completely from the current Midshipman Regulation is procedurally improper and falls short of principles of fairness and due process.  Simply, a person cannot be tried for violating a law/regulation that no longer exists.

6.    **Seventh Charge.**  The seventh charge against Midshipman Yu alleges is that he "*willfully vandalized the personal property of Saudi Arabian nationals, … in violation of Section 1109.5 of the Midshipman Regulations*".   Once again, this charge against Midshipman Yu is improper, as the charged offence relates to a section in a superseded regulation, i.e. the 2011 Midshipman Regulations, which was omitted in the new regulation.  (See prior discussion on this topic.)  Nonetheless, we point out to the fact that the Executive Board found Midshipman Yu not at fault of this alleged violation with a vote of 5-0, and we will forego further discussion herein.

**C.    Unproven/Unsupported Allegation of Excessive Alcohol Consumption**

There is **no** evidence that Midshipman Yu consumed an excessive amount of alcohol.  At most, the witness testimony demonstrates that Midshipman Yu consumed at most 6 or 7 drinks – plus the "spiked drink" during the span of an entire evening.

As you are aware, blood alcohol content (BAC) is the concentration of alcohol in the blood stream, and multiple factors can influence an individual's BAC, for example: amount of alcohol consumed, body/type weight, physiological differences between men and women, medications, etc.  A person is usually considered to be "legally intoxicated" when they have a BAC of 0.08 and the person is prohibited from driving a motor vehicle.

The Academy's own evidence demonstrates that Midshipman Yu consumed only six (6) to seven (7) alcoholic drinks on the date of the incident, that his first drink was at approximately 19:30, and

his last drink was before 00:00 (i.e. 4 ½ hours).  Midshipman Yu's weight at the time of the incident was 200 lbs.  (Note: NCIS Investigation Report notes him as 220 lbs.)

At approximately 02:20 am, nearly **seven** (7) hours after he took his first drink, Midshipman Yu's BAC was determined to be 0.214 by the Bahrain Government Authorities.  The NCIS Report notes that Midshipman Yu underwent "breathalyzer/blood" test while in custody by the Bahrain Police; however, the NCIS report only contains a blood test report, and no breathalyzer report.

With these facts in mind, the below table illustrates the predicted/estimated BAC or Midshipman Yu, for six (6) drinks and seven (7) drinks, at 00:00 (i.e. 4.5 hours after he started drinking), and at 02:30 (i.e. 7 hours after he started drinking – and, when the Bahrain Government took his BAC). (Note: In the interest of brevity we refer here to only six (6) blood alcohol content calculators. Yet, multiple additional consulted sources produced similar and consistent results.)

| BAC | | |
|---|---|---|
| | **4.5 hours (00:00)** | **7 hours (02:30)** |
| **Alcohol Help[2]** | | |
| 6 drinks | 0.052 | 0.010 |
| 7 drinks | 0.074 | 0.031 |
| **Health Status[3]** | | |
| 6 drinks | 0.060 | 0.030 |
| 7 drinks | 0.080 | 0.050 |
| **Celtic Kane[4]** | | |
| 6 drinks | 0.039 | 0.000 |
| 7 drinks | 0.058 | 0.016 |
| **Lifeloc[5]** | | |
| 6 drinks | 0.038 | 0.000 |
| 7 drinks | 0.057 | 0.014 |
| **Progressive[6]** | | |
| 7 drinks | 0.032 | 0.051 |

---

[2]  Alcohol Help Center.  Blood Alcohol Calculator.  Accessed: August 9, 2018.  Available: http://www.alcoholhelpcenter.net/Program/BAC_Standalone.aspx.
[3]  Health Status.  Blood Alcohol Calculator.  Accessed: August 9, 2018.  Available: https://www.healthstatus.com/calculate/blood-alcohol-bac-calculator/.
[4]  Celtic Kane.  Blood Alcohol Content Calculator.  Accessed: August 9, 2018.  Available: http://celtickane.com/projects/blood-alcohol-content-bac-calculator/.
[5]  Lifeloc.  Blood Alcohol Calculator.  Accessed: August 9, 2018.  Available: https://www.lifeloc.com/calculator.
[6]  Progressive.  Blood Alcohol Concentration (BAC) Calculator.  Accessed: August 9, 2018.  Available: https://www.progressive.com/vehicle-resources/blood-alcohol-calculator/.

| Craig Medical[7] | | |
|---|---|---|
| 6 drinks | 0.063 | 0.084 |
| 7 drinks | 0.025 | 0.047 |

Despite the minor variations in the predicted/expected BAC levels noted above, it is clear that it would have been **impossible for Midshipman Yu to have a BAC of 0.214 at 02:20** as reported by the Bahrain Governmental Authorities. This is simple arithmetic. For Midshipman Yu to have tested near a BAC of 0.214 at 02:20, **he would have had to consume fifteen (15) to seventeen (17) drinks in the 4 ½ hours** he was witnessed to have been drinking. Yet, there is **no testimony from any witness** which alleges that Midshipman Yu consumed anything over six (6) to seven (7) alcoholic drinks in that amount of time.

NCIS toxicology report showed zero (0) alcohol level. NCIS blood sample was taken thirteen (13) hours after the Bahrain police sample was taken. Humans have very consistent alcohol metabolic rate of 0.015 per hour (https://bgsu.edu/recwell/wellness-connection/alcohol-eduacation/alcohol-metabolism.html). Simple math reveals that 0.214-(13hrs. X 0.015) = 0.019 which is a significant BAC. Therefore, Bahrain Government or NCIS BAC report is not accurate. Since there is no mention by the investigating NCIS officers or by the witnesses, that Midshipman Yu consumed more than six (6) to seven (7) drinks, and that to reach 0.214 at the time of the incident, Midshipman Yu would have had to have consumed fifteen (15) to seventeen (17), one must conclude that Bahrain Government BAC result is inaccurate.

It is clear that the Bahrain Governmental BAC report is **not** supported by extrinsic evidence; thus, its reported results are suspicious and unverifiable. The reported results are not admissible as evidence as they are uncertified, and not supported by any documentation of approved governmental testing facility. Simply, there is no means to determine with reasonable certainty, scientific or otherwise, that the test conducted were conducted under acceptable scientific controls and standards.

Furthermore, the Academy produced no witness to testify as to the validity or reliability of the Bahraini tests results. Chemical analysis is testimonial in nature; thus, Midshipman Yu has a right to question the party who conducted the test. With the significant delays on trying this matter, the Academy could have easily coordinated telephone and/or video testimony from Bharani laboratory/testing personnel. However, the Academy did not do so, preferring instead to blindly rely on inadmissible and uncertified evidence, depriving Midshipman Yu of the opportunity to question the witnesses and evidence therein.

---

[7] Craig Medical Distribution, Inc. Blood Alcohol Concentration (BAC) Calculator. Accessed: August 9, 2018. Available: http://craigmedical.com/BAC_Calculator.htm?gclid=EAIaIQobChMIn-qGytjg3AIViIizCh3U2gaOEAMYASAAEgL7VPD_BwE.

**D.      Communications between Midshipman Yu and His Father**

The Superintendent mischaracterizes the text message conversation between Midshipman Yu and his father, taking the text messages completely out of context.  This leads to the incorrect inference that Midshipman Yu's father instructed him to 'fabricate' an excuse for the incident.  Nothing could be further from the truth.  First of all, Midshipman Yu's father is a graduate from the U.S. Air Force Academy, and a retired commissioned officer of the U.S. Air Force.  He is also an experienced federal law enforcement officer, and Captain with the Southwest Airlines, who has conducted numerous investigations involving flight crewmembers involving alcohol.  The fact is that Midshipman Yu spoke at length with his father over the phone, attempting to figure out what had occurred and seeking his assistance.  After all, Midshipman Yu had just woken up in jail, on a foreign land, being accused of serious violations, while not being able to remember anything about such incident.  Midshipman Yu's father provides a clear description of the conversation on this regard, specifically:

> "*What I said was after talking to Elias for almost 4 minutes where he repeatedly said he had absolutely no memory of the incident and that he felt weird.  He suspected something was in his drink and he talked about the possibility that it may have contained drugs.  So after that conversation and reflection, I also came to the conclusion that he was most likely drugged with a spiked drink from the girls working there.  It was 10-20 minutes later after our Messenger internet phone conversation to texting and more time during texting because time stamp on Facebook Messenger does not show each time if there is active texting once every 15-20 minutes.  So after carefully reviewing what he told me, I confirmed to him that he got ruffied (generic term for date rape or spiked drink) because in all my 24 years in Air Force, 21 years in commercial flying, and 10 years in law enforcement experience indicated that he was most likely to have consumed a drug spiked drink*."  (See Mr. Jae J. Yu's correspondence, attached herein as Exhibit "**S**".)

It was reasonable that Midshipman Yu would seek help from those he trusted the most.  The Superintendent's assertion based solely on the NCIS Investigation Report, that Midshipman Yu's father told his son that he "*should say you thought you were drugged*" is completely erroneous.  Midshipman Yu's father testified at the Executive Board hearing that the NCIS report incorrectly attributed actions against him, specifically stating that, "*… the NCSI report says I put the words in his mouth.  Nothing could be the truth.  What I said was, could this be it?  Because it is so out of character*."  (See Executive Board transcript, p. 236-237, attached herein as Exhibit "**R**".)

The Academy produced **no** witness or sworn statements, to support the statement/findings contained in the NCIS Investigation Report.  Although, Midshipman Yu's father appeared and provided testimony in person at the Executive Board hearing, none of the board members questioned him about the text messages and conversation with his son.  The Superintendent's and blind reliance on the unsupported statements contained in the NCIS report, is improper and unfounded.

Furthermore, Midshipman Yu's direct testimony refuted the allegations by RADM Dunlap that his father had given him the idea that he had been roofied.  Specifically, Midshipman Yu testified that,

MIDN. ELIAS J. YU: When I came to, I managed to get signal and call my parents, I told them what the authorities had told me, which was that I crashed the vehicle. And I thought that I was a part of some--I thought they were scamming me, I don't know what was going on. And so I called home, I told him the last things I could remember at the time when I woke up. My last memories were from Rocky's.

…

MIDN. ELIAS J. YU: In that phone conversation, I told him what I could remember. Remember telling him the drinks I had, taking a drink from a female, and then I couldn't remember, and waking up in that cell.

. . .

MIDN. ELIAS J. YU: Well, I had some suspicion of my own that there was something wrong. But we had, I guess, both come to the conclusion.

…

MIDN. ELIAS J. YU: I can't tell, I don't know if I was drugged until I guess, later with evidence. Or I had to tell them my suspicions.
(See Executive Board Hearing transcript, p. 96-98, attached herein as Exhibit "**R**".)

The fact is that Midshipman Yu was extremely nervous following his arrest, and fortunately he was able to reach his parent.  He told them of what he was being accused and what limited things he could remember.  Soon it became clear that he had been likely drugged through the drink he took from the girls.   A complete reading of the text messages clearly demonstrates that Midshipman Yu was simply stating that he would communicate his suspicion of what led to the incident and not that he was fabricating a story.


**E.     The Academy Provided No Warnings of "Spiked Drinks"**

Midshipman Yu was not warned about the potential risks associated with "spiked drinks", and he had no reason to suspect that he could be a victim of such action.  Midshipman Yu testified directly that no one at the vessel or Academy warned him of the potential dangers of drink spiking in Bahrain.  At Midshipman Yu's Executive Board hearing, the Academy produced Dr. Richard Wall, who testified that as part of his "Sea Lecture" that he made what best could be described as a "mention" of spiked drinks.  However, the Academy provided no witness to corroborate Dr. Wall's statement, and Dr. Wall did not produce a copy of his presentation at the hearing.  All of the midshipmen who testified at the hearing – including but not limited to, MN Krystian Abbott, MN James Cannell, MN Tyson Blauw, MN Garrett Irizarry and MN Ivan Goretoy – all of whom attended Dr. Wall's presentation, could not remember Dr. Wall mention or discussing "spike drinks".  (See Executive Board Hearing transcript p. 212, 214, 216, 218- 219, and 221, attached herein as Exhibit "**R**".)

**F.     Defective NCIS Drug and Alcohol Testing**

The NCIS drug test was defective, untimely, incomplete, and constituted a warrantless search. Furthermore, despite the Superintendent's assertion to the contrary, the NCIS drug test was not conducted "*within hours after the incident*".  The fact is that the NCIS collected blood and urine samples from Midshipman Yu on December 9, 2017, between 3:28 and 3:14, nearly thirteen (13) hours after the incident had occurred.  (See NCIS Investigation File (Report), attached herein as Exhibit "**F**".)  The record contains no reasonable explanation as to why the NCIS would delay collecting of these samples for such a long period.  As previously mentioned, there is no evidence that the NCIS obtained any warrant to obtain Midshipman Yu's urine or blood samples.

**1.     Timeline and Results**

On **December 18, 2017**, nine (9) days after collection, the samples were sent via FedEx – a commercial carrier – to Dover Air Force Base for testing.  The samples arrived on **January 5, 2018**, which is nearly twenty-seven (27) days after collection took place.  Thereafter, the Forensic Toxicology Laboratory, Armed Forces Medical Examiner System, issued a report in which it reported the following: ETHANOL: The BLOOD was examined for the presence of ethanol at a cutoff of 0.020 g%.  No ethanol was detected.  DRUGS: The URINE was screened for amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine, opioids, phericyclidine, sympathomimetic amines, and alkaline extractable drugs by immunoassay or liquid chromatography time of flight mass spectrometry.

There is no mention of any tests conducted for Tramadol, GHB, or similar commonly used "date rape" drugs.  Furthermore, the report contains no mention of the condition of the samples (blood and urine) upon arrival and upon testing.  These facts raise doubts as to the reliability of the test conducted by the NCIS.  Tramadol is not Benzodiazepine drug.

**2.     Expert Toxicologist Report**

Dr. Richard Stripp, an expert toxicologist from American Scientific Consultants Corp., evaluated the drug test evidence and explains why the NCIS did not find any drugs in Midshipman Yu's system.  Dr. Stripp noted that the NCIS toxicology report shows that Midshipman Yu's urine was <u>only</u> screened for "*amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine, opioids, phericyclidine, sympathomimetic amines, and alkaline extractable drugs*".  Dr. Stripp notes that many drugs require targeted testing and are not detected in standard toxicology screens and thus may not have been identified in the NCIS screening, and that these "*include various drugs that may be utilized to incapacitate a victim for the purposes of committing a crime.*"  Dr. Stripp notes that "*GHB (gamma-hydroxybutyric acid) a primarily known date rape drug, metabolizes out of a healthy normal body very quickly, and is not easily detectable in urine after as short as a couple of hours.*"  However, the "*NCIS Investigation Report notes that Midshipman Yu's urine was collected approximately 13 hours after the Bahrain collected sample.*"  And, the report "*does not mention whether the Bahrain Police conducted any tests for GHB.*"  At that the time of the NCIS

sample collection, GHB would "*be very difficult to detect if at all.*"  Furthermore, "*GHB is also difficult to detect in hair samples beyond normal threshold base, due to the body's fast metabolizing of its components.*"  However, Midshipman Yu's GHB concentration was so high, that nearly 3 months after the incident, GHB was still detectable in his hair.  (See Dr. Stripp's expert report attached herein as Exhibit "**T**"; Note: This report was previously disclosed to the Academy as Exhibit "F" in Exhibit "J" attached herein.)

Dr. Stripp concludes that "*due to the nearly 13 hour delay of collection of testable samples, and the actual tests conducted by the NCIS, it cannot be determined with reasonable scientific certainty, whether any of these drugs were or not present in Midshipman Yu at the time of the incident*".  Furthermore, alcohol was not detected in the sample tested by the Navy – a sample that was collected approximately 13 hours after the incident.

The Academy did not introduce any witness or expert testimony to refute Dr. Stripp's expert findings.  Nonetheless, the Superintendent asserts that Midshipman Yu's drug test (hair follicle) only shows that Midshipman Yu took Tramadol "within a 90 day window."  This is incorrect.  **The drug test results demonstrate that Tramadol was "present" in Midshipman Yu's system for the time frame of November 24, 2017 to December 22, 2017**.  The incident herein occurred on December 8-9, 2017, which is within the time frame this drug was present in Midshipman Yu.  Furthermore, numerous articles provided to the Executive Board in Exhibits "**J**" and "**Q**", document the use of Tramadol and other "date rape" drugs.  The Superintendent's assertions are unfounded and unsupported by the evidence.

## G.    Alleged Difference Versions of the Incident

In reference (b), the Superintendent states that Midshipman Yu provided "*two different versions*" of when he thought he might have taken the drug, which involved "*different bars, and described different drinks*".  The Superintendent relies on the hearsay recollection of one of the NCIS investigating agents as noted in the NCIS report.  However, Midshipman Yu has consistently testified as to where the "spiked drink" was given to him.  There are not "*two different versions*" here.  There is only one version; the one which Midshipman Yu has consistently testified to; the one Mr. Veasna – the Academy's witness – corroborates; and, the one that multiple written statements corroborated.  (See refence (b), attached herein as Exhibit "**A**"; Exhibit "**R**"; and, Exhibit "**F**".)

Furthermore, the Superintendent's ignores that Midshipman Yu repeatedly stated to the NCIS agents, that he could not remember the incident and that he was trying to put together what occurred to the best of his recollection.  Midshipman Yu was under extreme pressure and fear at the time of his questioning.  Midshipman Yu had never been interrogated by law enforcement officers.  Not even for a moving violation.  Yet here he was, on a foreign land, being accused of serious crimes, having no legal representation, alone, and being interrogated by federal law enforcement officers.  Perhaps Midshipman Yu – or, the NCIS agent – confused the bar names during this intense interrogation.  However, the clear testimony of Mr. Veasna sets aside all doubts as to where the spiked drink was given to Midshipman Yu, which is consistent with Midshipman Yu's testimony at the Executive Board.

The Academy produced no witness to testify as to the contents of the NCIS Investigation Report, and interviews of Midshipman Yu. With the significant delays on trying this matter, the Academy could have easily coordinated telephone and/or video testimony from one of the NCIS investigating agents. However, the Academy did not do so, preferring instead to blindly rely on inadmissible and uncertified report, depriving Midshipman Yu of the opportunity to question the interviewing witnesses and statements therein.

## H.    PHASE II – Retention Recommendation with Conditions

According to reference (b), the Executive Board recommend that Midshipman Yu be retained at the Academy and setback to the Class of 2020, that he continue with alcohol counseling, that he attend anger management class, and that he contribute in "some way" to the Sea Year lecture on alcohol in order to bring attention to the dangers of drink spiking overseas. (See refence (b), attached herein as Exhibit "**A**".) While we disagree with the findings of Phase I, in that Midshipman Yu was found to have been at fault, we recognize the Executive Board's decision that he should be retained at the Academy.

In accordance with the 2018-7 Midshipman Regulations, after a midshipman has been found at fault during Phase I of an Executive Board hearing, a second phase (Phase II) will be conducted wherein the sentence/disciplinary action against the midshipman will be considered. During Phase II, a midshipman may "*present evidence, including written statements from witnesses, and call witnesses to demonstrate exceptional potential for development and present extenuating and/or mitigating evidence and arguments for retention at the Academy or for minimum or no disciplinary action.*" The burden of "*demonstrating sufficient cause for retention by a preponderance of the evidence*" rests with the midshipman.

It is respectfully submitted that MIDN Yu met and **exceeded** the burden of demonstrating sufficient cause for **retention** at the Academy.

## 1.    Proven Academic Performance

Despite having to deal with the uncertainty of his future at the Academy, Midshipman Yu has continued to excel academically and currently maintains a solid cumulative average of 3.13. (See Academic Transcript, attached herein Exhibit "**U**".) In fact, Midshipman Yu earned an academic gold star for the third term of academic tear 2017-18.

## 2.    Proven Exceptional Performance

Midshipman Yu provided over eighteen (18) written statements from multiple professors, officers, classmates and mentors, to demonstrate his good character, exceptional performance and potential for service. (See Exhibits "**J**" and "**Q**".) While Midshipman Yu would have liked to have every person, who provided him with a letter testify at the Executive Board – all of whom stated they

would – defense counsel was asked by the Academy's counsel to "limit" the number of witnesses Midshipman Yu brought to testify in Phase II. Therefore, Midshipman Yu abided and provided only the in-person testimony of the previously stated individuals. The below are several notes from the testimony live witnesses provided at the Executive Board hearing. These witnesses attested to Midshipman Yu's good character, demonstrated leadership, demonstrated care for others, team efforts, and positive potential for future service as a U.S. merchant mariner and military officer. Below are some of the highlights from these witnesses. (Note: Their complete testimony is contained in the Executive Board transcript, attached herein as Exhibit "**R**".)

(1)   **LT John Jaeger**, Midshipman Yu's Company Officer testified favorable on behalf of retaining Midshipman Yu at the Academy, and stated that: Midshipman Yu is a mild-mannered and respectful midshipman who earned his respect; Midshipman Yu was always present to volunteer and help out; he was confident that Midshipman Yu would perform well at seal; he was surprised and thought it was a mistake when he heard that Midshipman Yu had been involved the incident herein; he thought it might have been someone else and not Midshipman Yu; when Midshipman Yu came back he was "down", but that he stepped up to the plate, becoming and excelling in multiple projects; when Indoctrination came around, and having the opportunity to go home and be with his family, Midshipman Yu declined and stayed at the Academy to help out during Indoctrination; Midshipman Yu did a fantastic job, leading his platoon well and showing them exactly the type of leader he would be – compassionate, confident, stern but caring; Midshipman Yu led his platoon to the best drill level LT Jeager has ever seen at Kings Point, while at the same time mentoring "*his rival*" platoon, which came in second place; Midshipman Yu is a young man with morals and values; Midshipman Yu is what the Academy is trying to make; that perhaps he (LT Jeager) sent Midshipman Yu to sea unprepared; and, that perhaps the Academy has not been more honest about training of midshipmen. LT Jeager concludes by stating that Midshipman Yu is a "*tremendous young person who has tremendous potential to be a leader in any situation that he's in, and he has qualities that exceed some of his peers.*" (See Executive Board Hearing transcript p. 201-211, attached herein as Exhibit "**R**".)

(2)   **Dr. Daniel Fong, Professor.**  Dr. Fong a faculty member and former professor of Midshipman Yu also testified favorably on behalf of Midshipman Yu. Dr. Fong testified that: in terms of behavior, of character in class, that he would place Midshipman Yu him in top five percent; Midshipman Yu is very polite, sincere, and he has shown that he can perform academically well above the average; Midshipman Yu received two silver stars and one senior ribbon; Midshipman Yu's transcript demonstrates very good and solid grades; Midshipman Yu shows that he cares about the Academy; Dr. Fong has never heard any bad things about Midshipman Yu from other midshipmen; Midshipman Yu has a very good personality; that he (Dr. Fong) was in shock when he first heard about the incidents involving Midshipman Yu, and that he could not believe it was possible or that it had actually happened. Dr. Fong concluded by stating that he believed Midshipman Yu was innocent, and because of that he waited for nearly four hours to testify at

the Executive Board.  (See Executive Board Hearing transcript p. 141-142, attached herein as Exhibit "**R**".)

(3)    **MN John Robertson**.  Mr. Robertson, one of Midshipman Yu's classmates, testified favorably on behalf of Midshipman Yu.  Mr. Robertson stated that: he first met Midshipman Yu as plebes and knows of Midshipman Yu's favorable reputation at the Academy; when he thinks of Midshipman Yu, he thinks of his personality, his character and his humor; Midshipman Yu was the person that would bring them all together; Midshipman Yu is very well respected by him and his classmates; no matter what, Midshipman Yu will continue to be a leader at the Academy, be respected, his opinions would be valued, and he would still be looked up as a leader by him and his classmates.  Mr. Roberson concluded by stating that he has never seen Midshipman Yu lie or do anything out of the ordinary, that would lead him to question Midshipman Yu's integrity.  (See Executive Board Hearing transcript p. 146-147, attached herein as Exhibit "**R**".)

(4)    **MN Luke Theriault**.  Mr. Theriault, another of Midshipman Yu's classmates, testified that: he met Midshipman Yu as plebes; Midshipman Yu was always squared away; Midshipman Yu volunteered to work as a Drill Instructor, under the Platoon Commander, during Indoctrination to train twelve (12) new plebes; although not required, Midshipman Yu would stay late at night standing watch to make sure the new plebes were set up well for the evening and teaching them how stand a proper watch; he selected Midshipman Yu to step up to the position of Platoon Commander, due to his leadership and training skills; Midshipman Yu's efforts – in a short amount of time – led to his platoon receiving "Honor Platoon" honors; Midshipman Yu has always been super-professional and super-disciplined; Midshipman Yu set the good example of what right 'should look like', so it enabled the new plebes to really follow his example; when Midshipman Yu walked the deck, the new plebes would "*tightened up a little bit, everyone stood a little straighter, because they wanted to kind of impress him, or live up to his standards that he set for them*"; Midshipman Yu is always calm, reserved and composed.  When questioned as to whether or not he thought that Midshipman Yu would "*look to improve his character and redeem himself*", Mr. Theriault responded affirmatively stating, "*I think he already did.  Like I said, I believe the incident was a long time, many months ago, and since then, I think producing the best platoon out of Indoc.  Everyone coming back from the regiment saw that. They all know that second company was--he had a part in that. I don't think there's any redemption to be done, because I think it's already been done. His character kind of speaks for himself. I don't think anyone quite believed what they heard, because it's not really something that they would have associated with him.  So, I don't think he has much convincing to do. I think what everyone knows of him is enough for them to agree that he belongs in the regiment.*"  (See Executive Board Hearing transcript p. 150-156, attached herein as Exhibit "**R**".)

(5)    **MN Wiley Martin**.  Mr. Martin, another of Midshipman Yu's classmates, testified that: he owed to Midshipman Yu the fact that was still at the Academy; Midshipman

Yu regularly made time to help him in his studies; that when he was having difficulty with Calculus and Physics, Midshipman Yu appeared at his room, introduced himself and told him that he would see that Mr. Martin would pass the classes; Midshipman Yu kept his word and almost every night Midshipman Yu would come to his room to tutor him and ensure he passed; Midshipman Yu demonstrated his true character in helping him (then "an unknown") classmate get through; Midshipman Yu would help him train early mornings, to make sure he succeeded in the football team, motivating him to work hard and become a starter; he was able to earn "Rookie of the Year" honors thanks to Midshipman Yu's help; Midshipman Yu is part of their family, the person that would walk into the Resource Room at night, surrounded by five plebes, helping them, just to ensure that they get through; Midshipman Yu cares for others as family; Midshipman Yu would keep tabs on him, ensuring that he was keeping up on his required projects; he credits the fact he turned in all his project to Midshipman Yu's motivation and mentorship; not keeping Midshipman Yu in the regiment would be detrimental; he would follow Midshipman Yu "*into battle any day*", that "*I don't care where we go, I know that if I'm with Elias, then I'll be okay, and he'll lead us in the right direction*."; that Midshipman Yu is "*going to lead you in the right direction. He's going to take care of his people.*"; Midshipman Yu regularly tutors plebes, second classmen, third classman, and perhaps even seniors; Midshipman Yu's leadership let his platoon to earn Honor Platoon honors; Midshipman Yu is a great motivator; Midshipman Yu looks out for people, that Midshipman Yu will "*pick anybody up, and he'll ensure they get to the finish line, running PFAs with seniors returned from sea, helping the plebe who failed the PRT in Indoc pass his PRT in the first trimester*"; Midshipman Yu is "*what the Academy wants to produce*"; he does not see anybody better than Midshipman Yu; Midshipman Yu is "*the type of man that the Academy wants to graduate, and put into the Armed Forces, and lead men and women into battle in the future.*" Mr. Martin also discussed Midshipman Yu's positive attitude, motivation, teamwork, flexibility and willingness to contribute to the football team in any capacity necessary. Mr. Martin concluded by stating that Midshipman Yu is an asset to the Academy, that it is an absolute positive thing for Midshipman Yu to remain in the Academy and graduate, and "*then eventually put on a second lieutenant or ensign bar, after he graduates, and to lead brave men and women into battle, just take care of them after he graduates.*" (See Executive Board Hearing transcript p. 159-170, attached herein as Exhibit "**R**".)

(6)   **MN Jacob Wallace**. Mr. Wallace, another of Midshipman Yu's classmates, testified that: Midshipman Yu is a person of good moral character and standing; the Bahrain incident not indicative of Midshipman Yu's character; and, Midshipman Yu has the traits and qualities that he wishes officers around him will have. Despite the Academy's leading questions, in what appeared to have been an effort to have Mr. Wallace testify detrimentally in regard to Midshipman Yu's prior alcohol consumption, Mr. Wallace was clear that he had never seen Midshipman Yu intoxicated. (See Executive Board Hearing transcript p.172-175, attached herein as Exhibit "**R**".)

(7)    **MN Andrew Daniel**.  Mr. Daniel, a former classmate of Midshipman Yu testified, that: Midshipman Yu counseled and convinced him to remain in the Academy; Midshipman Yu ensured that another resigning midshipman thought through everything rationally and logically, before resigning; Midshipman Yu cares about every single one of his classmates, shipmates and midshipmen; Midshipman Yu helped him to overcome difficult times with projects and time management skills; when he faced disenrollment – due to failed projects – Midshipman Yu was the first one to come and offer his assistance; that facing difficulties, he had decided to resign from the Academy, but Midshipman Yu stepped forward and told him that they were family, that no one was being left behind, and that he was not going to give up on him; he did not resign from the Academy, thanks to Midshipman Yu; he could not believe Midshipman Yu had been involved in the Bahrain incident – "*there's absolutely no way, this is completely out of your character, this is completely out of any realm of reality I live in, that anything like this would happen*"; when he got back and was ready to head to sea, he found out that he was missing required materials, Midshipman Yu stepped up and brought him all required materials, aiding him in being able to complete his projects; Midshipman Yu was the only class member who regularly called him at home to find out how he was doing, to counsel and to motivate him; Midshipman Yu knows how to lead, has a great rational mindset and ability to look at things logically and rationally; when he was assigned to work Indoc, Midshipman Yu volunteered to work with him; Midshipman Yu quickly stepped into the Platoon Commander position, motivating his platoon and leading them to win the drill competition; Midshipman Yu was a role model for his platoon; Midshipman Yu is a great diffuser of troublesome situations; Midshipman Yu is a model midshipmen; that even from plebe year, Midshipman Yu was someone to look upon as an example of how to get things done, rather than giving up; Midshipman Yu is a great leader and friend; Midshipman Yu knows how to lead, he knows how to present arguments, he knows how to think rationally.  Mr. Daniel concluded by stating that Midshipman Yu is "*one of the greatest future officers, and future leaders that's ever-attended Kings Point*".  (See Executive Board Hearing transcript p. 177-188, attached herein as Exhibit "**R**".)

(8)    **MN Ing Hao Veasna**.  Mr. Veasna was the Academy's leading witness on Phase I of this hearing.  He is a classmate of Midshipman Yu and testified on behalf of Midshipman Yu on Phase II.  Mr. Veasna testified that: what occurred in Bahrain is definitely not Midshipman Yu's true character; Mr. Veasna couldn't believe what happened, he thought it was a joke; Midshipman Yu has strong character; Midshipman Yu could have easily quit, but he has not; the Bahrain incident "*could have easily been me that night.  I was with Elias, I could have easily taken that drink. So that easily could have been me, it was just unfortunate that it happened to him*"; Midshipman Yu has the potential to stay at the Academy; Mr. Veasna does not know how Midshipman Yu does it and keeps focused, including working Indoc, caring for incoming plebes, and wanting to develop them into leaders; Midshipman Yu has a great character; Midshipman Yu worked hard to be a great teammate; Midshipman Yu would "*go out and go to bat for anybody, any one of his*

*teammates, any one of his classmates, anyone in the regiment*"; Midshipman Yu is "*the calmest guy*".   When questioned by the Academy, whether he has seen Midshipman Yu intoxicated, Mr. Veasna stated that, "*when he's intoxicated, he's nothing crazy.  He didn't act like this when I was with him. I mean, I've only had very few experiences with him while intoxicated.  But this is not--this is out of character for him*."  Mr. Veasna also stated that, while he has seen Midshipman Yu consume almost the same amount of alcohol as during the date of the Bahrain incident, i.e. "*close to six drinks*", Midshipman Yu's prior behavior had not been anything like how he acted on the date of the incident.   (See Executive Board Hearing transcript p. 223-228, attached herein as Exhibit "**R**".)

(9)    **Mr. Ralf Irizarry**.  Mr. Irizarry is a Navy Veteran, a coach at the Academy, father of one of Midshipman Yu's classmates, and a mentor to many midshipmen at the Academy.  Mr. Irizarry testified that: Midshipman Yu is going to be a credit to his family, to the Academy and to the United States; it would be a total discredit and unfair to the Academy if Midshipman Yu was disenrolled; Midshipman Yu's is a leader and mentor, demonstrating these skills often; Midshipman Yu displays 'officer material'; "setback" of Midshipman Yu would be in the best interest of the Academy; Midshipman Yu's classmates are there to testify, not afraid of the board members, but rather afraid of what might happen to Midshipman Yu; over the last six months Midshipman Yu has been punished, and yet he has displayed exemplary conduct at the Academy; Midshipman Yu understands and values his commitments at the Academy.  Mr. Irizarry concludes by stating that Midshipman Yu is a leader and will always be a leader.   (See Executive Board Hearing transcript p. 189-199, attached herein as Exhibit "**R**".)

## CONCLUSION

For the reasons stated above, the Superintendent's disenrollment decision should be set aside, and Midshipman Elias J. Yu should be permitted to remain and continue his studies at the U.S. Merchant Marine Academy, as a "setback", and without any conditions as recommended by the Executive Board.

It is clear that the Executive Board's decision on this matter was fraught with errors and unsupported/biased conclusions.   The Executive Board incorrectly admitted and weighed inadmissible evidence; ignored exculpatory evidence; ignored basic principles of due process, law and fairness; and, it applied vague standards/requirements from superseded regulations/notices.

After listening to compelling testimony from multiple witnesses, the Executive Board recommended that Midshipman Yu be retained at the Academy and setback to the Class of 2020, that he continue with alcohol counseling, that he attend anger management class, and that he contribute in "some way" to the Sea Year lecture on alcohol in order to bring attention to the dangers of drink spiking overseas.  While the "setback" is understandable, as Midshipman Yu has missed valuable underway (sea time), which impacts his ability to qualify for his U.S. Merchant

Marine License with his class, the Executive Board's recommended conditions are based on significant errors. Therefore, all of these "recommended conditions" should be set aside as well.

Admiral, Midshipman Yu is a bright and caring young man. Disenrolling him from the Academy would be a disservice to the Academy, the maritime industry, the military, and his classmates. Midshipman Yu is extremely well-thought by his classmates, professors and superiors. He is a fighter. He was a victim of something that could have happen to many of us. Despite facing this stressful situation, he has continued to perform admirably and with distinction at the Academy. He could have easily resigned from the Academy and avoid the embarrassment this incident has caused him. But, that is not his character. He is a leader, a friend and a mentor. Many others might not have made it this far, and as well as Midshipman Yu has done. Midshipman Yu's perseverance, persona, character, and care for others, is a credit to himself, his family and the Academy. We all should be lucky enough to meet more men like Midshipman Yu. He truly exemplifies the Academy's motto "Acta non Verba".

For the above reasons and many more, on behalf of Midshipman Elias Yu, his family and friends, we respectfully request that Midshipman Yu be permitted to remain and continue his studies at the U.S. Merchant Marine Academy.

## REQUESTED RELIEF

Midshipman Elias J. Yu, USNR, respectfully requests that the Superintendent's disenrollment decision contained in reference (b) be set aside, and that he permitted to remain and continue his studies at the U.S. Merchant Marine Academy.

Thank you for your attention and consideration in this matter.

Very respectfully,

GALLO VITUCCI KLAR LLP

Richard González, Esq.

Exhibits:

    A. Rear Admiral Helis Disenrollment Letter, dated August 1, 2018;
    B. Conduct Record Deficiency, dated Februray 28, 2018;
    C. Defense Counsel Letter with Exhibits, dated February 28, 2018;
    D. Email between Defense Counsel and Counsel to the Academy, dated March 5, 2018;
    E. Notice of Executive Board Disciplinary Hearing, dated March 14, 2018;
    F. NCIS Investigation File/Report;
    G. Defense Counsel Letter Adjournment Request, dated March 15, 2018;

H.  Email between Defense Counsel and Counsel to the Academy, dated March 19, 2018;
I.  Second Notice of Executive Board Disciplinary Hearing, dated April 11, 2018;
J.  Witness and Evidence List, dated April 19, 2018;
K.  Email between Defense Counsel and Counsel to the Academy, dated April 19-20, 2018;
L.  Email between Defense Counsel and Counsel to the Academy, dated April 20, 2018;
M.  Email between Defense Counsel and Counsel to the Academy, dated April 20, 2018;
N.  Email between Defense Counsel and Counsel to the Academy, dated April 20, 23, 2018;
O.  2018 Midshipman Regulations – Cover page;
P.  Fourth Notice of Executive Board Disciplinary Hearing, dated July 17, 2018;
Q.  Supplemental - Witness and Evidence List, dated July 23, 2018;
R.  Executive Hearing Transcript;
S.  Correspondence from Mr. Jae J. Yu, dated August 18, 2018;
T.  Dr. Richard Stripp, Final Report, dated April 16, 2018;
U.  Mr. Elias J. Yu, USMMA Academic Transcript, dated July 17, 2018.